**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| DAVITA INC., <br><br>              Plaintiff, <br><br> v. <br><br> UNITEDHEALTHCARE OF FLORIDA, INC. and ALL SAVERS INSURANCE COMPANY, <br><br>              Defendants. | Case No.: 1:16-mc-00201-WJM-KMT |

**UNITEDHEALTHCARE OF FLORIDA, INC. AND ALL SAVERS INSURANCE CO.'S OPPOSITION TO DAVITA'S MOTION FOR ATTORNEYS' FEES AND COSTS**

In its October 5, 2016 Motion to Quash, DaVita asked this Court for leave to seek fees associated with that motion. The Court implicitly rejected that request and closed the matter. Now, 30 days after the Court's final word on this issue, DaVita asks that it be revisited. Motions for reconsideration like the one at present are granted in only rare circumstances—where the controlling law or the evidentiary record has materially changed or where a prior ruling would represent manifest injustice if allowed to stand. DaVita's failure to demonstrate that any of those factors are present dooms its request and the Court need dig no deeper to deny DaVita's request that the Court reverse itself.

Moreover, DaVita's motion fails for an equally compelling reason—DaVita has not, and cannot, show that its decision to file a motion to quash represents an undue burden. Indeed, it was *DaVita* that unilaterally chose to upend the meet-and-confer process and seek judicial

intervention rather than to fulfill its obligations under D.C. COLO. L. Civ. R. 7.1(a).[1] The meet-and-confer process required by this Court prior to motion practice is designed for the explicit purpose of allowing parties the chance to resolve their differences and reduce unnecessary burden. UnitedHealthcare of Florida, Inc. and All Savers Insurance Co. (collectively, "United") were willing to and made repeated attempts to honor that process, but were denied that opportunity by DaVita's abrupt rush into court. Further, DaVita has continued to misrepresent itself as an innocent party in the dialysis industry with no relation to the Southern District of Florida litigation or the inappropriate relationship between dialysis providers and AKF that is squarely at issue in that case. DaVita's efforts to obfuscate its involvement in industry-wide misconduct warrant denial of any relief.

Recent revelations have made more apparent the strategic reasons underlying DaVita's decision to attempt to keep hidden its role (and the role of the American Kidney Fund) before this Court in the industry-wide fraud that is at the center of United's litigation. On December 14, 2016, only one month after this court granted DaVita's motion to quash, the Centers for Medicaid & Medicare Services ("CMS"), the Centers for Medicaid & Medicare Services ("CMS"), issued an interim final rule (the "IFR") addressing the precise misconduct alleged by United in its First Amended Complaint.[2] (Ex. 1, 42 C.F.R. Part 494, *Medicare Program; Conditions for Coverage for End-Stage Renal Disease Facilities—Third Party Payment*, Centers for Medicaid & Medicare Services.)

In explaining the rationale behind its rule making, CMS highlighted its finding that the problem of dialysis providers "offering to pay for, or arrange payment for" commercial insurance

---

[1] United did not oppose the Motion to Quash on these grounds, but noted its substantial efforts to obtain a meaningful conferral process with hopes to negotiate a reasonable resolution.
[2] The interim final rule, as well as the rationale behind it, can be found at: https://s3.amazonaws.com/public-inspection.federalregister.gov/2016-30016.pdf.

premiums appeared to be "widespread." (Ex. 1, at 11–12.) And it specifically called out United's litigation with ARA in support of this finding.[3] (Ex. 1, at 14.) In an effort to stop this industry-wide scheme and to protect patients from the numerous harms imposed on them by this coordinated conduct (Ex. 1, at 38), CMS required that providers—like DaVita and ARA—that indirectly pay patient premiums by routing money through third parties like AKF: (1) disclose third party payments to insurance companies; and (2) take steps to ensure that third-party payments cease if the insurance company indicates that it will not accept them. (Ex. 1, at 35.)

Notwithstanding its prior nothing-to-see-here protests to this Court about the company's role in the industry-wide scheme at issue in United's ARA litigation, DaVita announced to its shareholders that it was discontinuing its steering efforts—a decision that the company estimated would cost $140 million in annual profits.[4] (*See* Ex. 2, *DaVita Announces Change for Medicaid Patients Seeking Affordable Care Act Plan Coverage*, PR NEWS WIRE (Oct. 31, 2016, 2:22 PM EST), available at http://www.prnewswire.com/news-releases/davita-announces-change-for-medicaid-patients-seeking-affordable-care-act-plan-coverage-300353908.html, at 3.) Perhaps not surprisingly, ARA followed suit shortly thereafter—announcing it would do exactly what DaVita was doing. (*See* Ex. 3, *American Renal Associates Holdings, Inc. Announces Third Quarter 2016 Results*, BUSINESS WIRE (Nov. 10, 2016, 4:15 P.M. EST), available at http://www.businesswire.com/news/home/20161110006525/en/American-Renal-Associates-Holdings-Announces-Quarter-2016, at 5.) And an investigation by the *St. Louis Post-Dispatch* sheds light on why DaVita has fought so hard to keep its contributions to the scheme a secret and

---

[3] *See also* Ex.1. at 13, n.6 ("Davita encouraged some low-income patients to enroll in commercial plans.").

[4] On October 31, 2016, the same day United filed its opposition to DaVita's motion to quash, DaVita announced that it would suspend support for applications to the AKF for charitable premium assistance (HIPP).

may indicate why the company took the extraordinary step of walking away from such a money-making operation. (*See* Ex. 4, Samantha Liss, *DaVita Encourages Some Low Income Patients to Enroll in Commercial Plans*, ST. LOUIS POST-DISPATCH (Oct. 23, 2016), http://www.stltoday.com/business/local/davita-encouraged-some-low-income-patients-to-enroll-in-commercial/article_ec5dc34e-ca4d-52e0-bc26-a3e56e1e2c85.html.)

DaVita's internal e-mails obtained by the *Post-Dispatch* tell the story of how, over a period of years, "DaVita encouraged low-income patients with end-stage renal disease to enroll in commercial plans when they were already covered by Medicaid." (Ex. 5, Samantha Liss, *DaVita Changes Policy on Helping Patients Secure Financial Assistance*, ST. LOUIS POST-DISPATCH (Oct. 31, 2016), available at http://www.stltoday.com/business/local/davita-changes-policy-on-helping-patients-secure-financial-assistance/article_11745f6c-3830-59c5-845e-6167c81d6b91.html, at 4.) Referred to in DaVita's internal e-mails as the "Medicaid Opportunity," DaVita created a program designed to identify, target, and steer patients eligible for Medicaid into commercial insurance plans. (Ex. 4, at 4–6.) DaVita's dialysis center employees were foot soldiers, whose mission was to manipulate vulnerable Medicaid patients into signing up for a commercial insurance plan that they did not need and could not afford. (Ex. 4, at 4–5.) DaVita employees were given marketing materials with talking points to persuade the targeted individuals. (Ex. 4, at 5.) For example, DaVita told Medicaid patients that the "new coverage would improve access to transplants, to doctors that patients were 'unable to see today' and to treatment when traveling out of state." (Ex. 4, at 5.) They also wrongfully advertised the commercial plans as "low to no cost." (Ex. 4, at 5.) Although DaVita has claimed publicly that it was merely "educating" its Medicaid patients, according to the evidence obtained by the *Post-Dispatch*, the company closely monitored employee progress in converting Medicaid patients to

commercial plans and set conversion goals and timelines. (Ex. 4, at 5–6.) Further, the *Post-Dispatch* investigation uncovered e-mails of DaVita celebrating its success in steering over 75% of its targeted Medicaid patients, "Hooray! The Village has completed over 75% of interest conversations, and over 7,200 patients will receive enrollment education on the specific plans available in their market."[5] (Ex. 4, at 5.) The *Post-Dispatch* also found that DaVita tracked patients' AKF applications and did not allow any targeted patient to slip through its cracks--as DaVita's e-mails showed mandatory weekly or biweekly calls were implemented to discuss "validation" to disinterested patients. (Ex. 4, at 6.)

And on Christmas Day, the *New York Times* published an exposé on the efforts by the AKF to coordinate contributions among dialysis providers like DaVita and ARA in a pay-to-play scheme. (*See* Ex. 6, Katie Thomas & Reed Abelson, *Kidney Fund Seen Insisting on Donations, Contrary to Government Deal*, THE NEW YORK TIMES (Dec. 25, 2016,), http://www.nytimes.com/2016/12/25/business/kidney-fund-seen-insisting-on-donations-contrary-to-government-deal.html?_r=1.) The AKF's role as a hub in this scheme with providers is at the core of United's case—to the extent it was acting as has been reported publicly, "donations" made to the institution would violate various state and federal criminal and civil laws and evidence a conspiracy among dialysis providers (like DaVita and ARA) and AKF.

As CMS pointed out in explaining the basis for its IFR, the scheme was not limited to just one provider, but was "widespread," implicating potentially every provider that donated to AKF. DaVita has admitted that it is among those that have made such contributions and public reports suggest that its annual contributions (over $100 million per year) represent close to half of all "donations" AKF receives. (*See* D.N. 25, Ex. 3, *Financial Statements*, *December 31, 2015 and*

---

[5] "Village" is how DaVita refers to itself.

*2014*, American Kidney Fund, Inc. (Mar. 23, 2016), at 19.)

While these recent revelations may explain DaVita's herculean efforts to continue to shroud its role in this scheme in secrecy, the company's decisions to forego the meet-and-confer process—and to present a misleading factual record to this Court—do not render the "burden" of those efforts "undue" and do not justify the relief it again asks the Court to grant.

Accordingly, United respectfully requests that the Court deny DaVita's request in its entirety.

**I.  DaVita has offered no reason why the Court should reverse its previous implicit denial of DaVita's fees request.**

As this Court has previously held, where a moving party seeks attorneys' fees in successive motions, the latter is to be treated as a motion for reconsideration. *See King v. Solvay S.A.*, No. 14-mc-00196-LTB-KLM, 2015 WL 393860, at *5 (D. Colo. Jan. 29, 2015) (finding that a motion for attorneys' fees and costs was "essentially a motion for reconsideration of the Court's prior Order" although "the Motion is not phrased or argued as such"). DaVita's present request fits that bill.

In its October 5, 2016 Motion to Quash, DaVita asked the Court to address a request for the attorneys' fees associated with that motion. (D.N. 1, Pl.'s Mot. to Quash, at 13, n.6.) "DaVita respectfully requests leave under Fed. R. Civ. P. 45(d)(1) and/or 26(g) to move for attorneys' fees in the event that the Court grants the instant motion." (*Id.*) United opposed the request in its opposition to the motion. (D.N. 25, Def.'s Opp. to Pl.'s Mot. to Quash, at 14.)  The Court did not award DaVita that relief and ordered the case administratively closed. (D.N. 28, Order Granting Pl.'s Mot. to Quash; *see also* Ex. 7, Notice of Electronic Filing for Document 31 (Dec. 15, 2016).)

As the Tenth Circuit has held, where a party raises the issue of attorneys' fees (as DaVita

did) and a court declines to award the relief (as this Court did), that decision constitutes an implicit denial of the fee request. *See O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 903 (10th Cir. 1992) (affirming implicit denial of attorneys' fees); *Anderson v. Emergency Med. Assoc.*, 860 F.2d 987, 992 (10th Cir. 1988) (finding that the trial court implicitly denied attorneys' fees by only granting costs); *see also Voliva v. Seafarers Pension Plan*, 858 F.2d 195, 197 (4th Cir. 1988) ("The district court's judgment implicitly denied plaintiff's request for attorneys' fees by failing to address the matter."). Moreover, D.C. COLO. L. Civ. R. 54.1 governs the rules surrounding costs. "Each judgment or final order shall indicate any party entitled to costs." (*Id.*) The Court's final Order granting DaVita's motion to quash did not award DaVita its fees and costs. Accordingly, DaVita's present motion should be treated as a motion for reconsideration of the Court's prior implicit rejection of the requested relief.

"A motion for reconsideration 'is an extreme remedy to be granted in rare circumstances.'" *King*, 2015 WL 393860, at *5 (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir. 1995)). "It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991)). To justify a request for reconsideration, a moving party must demonstrate that at least one of three factors is present: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. (*See id.*) DaVita's motion for reconsideration is not founded on any of these grounds and therefore, necessarily fails.[6] The law has not changed and the Court's prior ruling has imposed no injustice – manifest or otherwise. To the extent there is new evidence

---

[6] To the extent that DaVita seeks solace in *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 13-cv-00769-MSK-KMT, 2014 WL 3057496, at *4 (D. Colo. July 7, 2014), that reliance is misplaced. In *Chumley*, the party seeking fees did not make a prior fee request at any point in its prior moving papers.

available, it only serves to undermine DaVita's disingenuous objections to the subpoena and baseless claims of undue burden.

Because DaVita has not so much as attempted to satisfy its burden in support of its request for the rarely granted relief that the Court reverse its prior ruling, the Court should deny the motion in its entirety.

**II.     DaVita has not identified any undue burden that it suffered.**

DaVita's motion for reconsideration should also be denied because the Court correctly declined to grant the requested relief the first time that DaVita asked. In United's First Amended Complaint, United alleged that AKF had an unlawful understanding with dialysis providers wherein, for providers' patients to get funding from AKF, the providers and AKF understood that the providers must donate substantial sums to AKF that were calculated and proportional to the amount of funding they wanted and expected their patients to receive. (*See* D.N. 1, Ex. 2, Pls.' First Am. Compl., *UnitedHealthcare of Florida, Inc., et. al, v. American Renal Associates, LLC, et. al*, No. 9:16-cv-81180-KAM (S.D. Fla. filed July 1, 2016), at 113–19.) Both ARA and DaVita openly admit they fund the AKF's HIPP program operations, and United subpoenaed DaVita for the purpose of obtaining discovery into how AKF's unlawful, industry-wide HIPP program rules were being deployed throughout the dialysis industry, as United had alleged. Rather than engage in a meaningful meet-and-confer process, DaVita rushed to Court with its motion to quash. Because DaVita imposed the burden of moving to quash on itself without engaging in the meet-and-confer process, DaVita has not suffered any undue burden that would justify awarding attorneys' fees.

Courts deny costs and fees when the party seeking discovery attempted to confer with the opposing party, for purposes of avoiding the expense of the motion and the undue burden that responding to the Subpoena would impose. *See W. Convenience Stores, Inc. v. Suncor Energy*

*U.S.A., Inc.*, Civil Action No. 11-cv-01611-MSK-CBS, 2014 U.S. Dist. LEXIS 42443, at *77–78 (D. Colo. Mar. 27, 2014) (because issuing party offered to reduce burdens by arranging meeting with opposing party, Court found this satisfied finding for "reasonable steps to avoid imposing undue burden or expense."). Moreover, a finding that requests are overbroad, without more, does not justify the award of attorneys' fees. (*See id.* at *75–76) ("While [the issuing party's] document requests could have been drafted more narrowly, that fact standing alone does not justify sanctions.") (citing *Legal Voice v. Stormans, Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013) (holding that the district court "need not impose sanctions every time it finds a subpoena overbroad; such overbreadth may sometimes result from normal advocacy, which we have said should not give rise to sanctions")).

It was with the intention of gathering evidence related to the Southern District of Florida litigation, and the proportional donation expectations applied by AKF to all donating providers, including DaVita, that United propounded its Subpoena. During an extraordinarily truncated meet-and-confer process, DaVita took a hardline with respect to its Rule 45 obligations—it would not produce a single document requested; it would not articulate what the burden of compliance with the requests would be; and it would not negotiate a narrowing of the requests in a way that would reduce any such alleged burden. United endeavored to find a path forward that would alleviate any unnecessary burden, but DaVita chose the path of litigation rather than negotiation and filed its motion to quash.

United did not impose any of the "burden" of drafting the Motion to Quash—to the contrary, United worked diligently to attempt to avoid imposing on the Court to resolve this issue. (D.N. 25, at 14.) Had DaVita wanted to avoid the burden of such motion practice (which it now claims was "undue"), it should have made a real attempt to honor its meet-and-confer

- 9 -

obligations. Having made its strategic choice to abdicate those responsibilities, DaVita should not now be permitted to shift the responsibility for any resulting burden of that decision to United.

Finally, it is important to note that, in its moving papers, DaVita presented a factually inaccurate record in an effort to persuade the Court that United sought the records at issue for some alternative purpose. DaVita asserted that United sought discovery "for possible use against DaVita under the DaVita-United Agreement" and "to use in its national efforts to influence regulations of HIPP and related matters." (D.N. 1, at 8.) DaVita claimed that United was using its Subpoena as a tool to conduct a fishing expedition with respect to potential claims against DaVita in the future. (D.N. 1, at 12.) As DaVita knew at the time it moved, those contentions were patently false and would be contradicted if the Court had the benefit of a complete record. But DaVita also knew that United could not correct that record without running afoul of a confidentiality agreement between the parties.[7] United therefore was, and remains, hamstrung in its ability to correct that record.

## CONCLUSION

DaVita cannot demonstrate that any of the bases upon which courts grant motions for reconsideration exist in this case. Controlling law has not changed; the Court's prior order implicitly denying fees does not impose an injustice; and, to the extent the evidentiary record has changed, those developments contradict DaVita's bases for objecting to the subpoena in the first place. DaVita decided to forego the meet-and-confer process and that strategic choice does not an undue burden make. Accordingly, United respectfully requests that the Court deny DaVita's motion in its entirety.

---

[7] As United informed DaVita, the half-truths that DaVita presented to the Court in support of its motion to quash likely breach contractual agreements between the parties.

United reserves its right to seek fees and related sanctions in the event that this Court denies DaVita's motion.

Dated: January 4, 2017   By: */s/ Jeffrey S. Gleason*
Jeffrey S. Gleason (admitted *pro hac vice*)

Louis Grossman (Co. Bar No. 48374)
lgrossman@messner.com
Messner Reeves LLP
1430 Wynkoop Street
Suite 300
Denver, CO 802027
T: (303) 623-1800
F: (303) 623–0552

Jeffrey S. Gleason (admitted *pro hac vice*)
William Bornstein (admitted *pro hac vice*)
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402–2015
T: (612) 349–8500
F: (612) 339–4181
jgleason@robinskaplan.com
wbornstein@robinskaplan.com

*Attorneys for Defendants UnitedHealthcare of Florida, Inc. and All Savers Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was electronically filed on January 4, 2017 with the Clerk of Court using the CM/ECF system thereby sending a notice of electronic filing to all counsel of record on the service list below.

                           */s/ Jeffrey S. Gleason*
                           Jeffrey S. Gleason (admitted *pro hac vice*)

**SERVICE LIST**

Andrew Howell Myers
myers@wtotrial.com
Kasey Kay Johnson
kjohnson@wtotrial.com
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street
Suite 4500
Denver, CO 80202
T: (302) 244-1800

Leonard A. Gail (*pro hac vice* pending)
lgail@masseygail.com
Hillary Coustan (*pro hac vice* pending)
hcoustan@masseygail.com
Massey & Gail LLP
50 East Washington Street
Chicago, IL 60602
T: (312) 283-1590

*Attorneys for Plaintiff DaVita Inc.*